On behalf of the plaintiff, excuse me, on behalf of the plaintiff at the lot, Mr. Daniel Murphy, on behalf of the City of Geneva, Mr. Anthony Ritrovato, and on behalf of Hillquist, this is Julie Simpson. Are both sides ready to proceed? Yes. I understand that you are going to divide your time? Yes, ma'am. Geneva will have, City of Geneva will have 10 minutes, and Hillquist Brothers will have 5? Is that correct? Okay. Counsel, are you ready to proceed then? Yes, Your Honor. I'll see you when you're ready. May the police and court counsel? Good morning, Your Honors. My name is Daniel E. Murphy, and I represent the plaintiff in this case, Elizabeth Tocheck. With respect to this particular matter, summary judgment was granted by the court on both defendants' motions for summary judgment. It is our position that the summary judgment should not have been entered as to either defendant because material issues of genuine fact precluded entry of summary judgment. The direct, as well as the circumstantial evidence in this case that is of record, relating to Ms. Tocheck's fall on the ice at the parking lot, reflects that the ice was an unnatural accumulation, which was caused either by the backdragging of the City of Geneva with an end plow, bringing the snow back onto the parking lot, or by spillage out of the bucket during that particular procedure, or through the melting and refreezing of snow piles that were placed at the periphery of the parking lot at an elevated level by Geneva's snow plow contractor, Hillquist, for both of those items. The main fact that really supports this is a specific finding that was made by Mr. LaMare, who is the superintendent in charge of the snow removal process for the City of Geneva. And he had written a number of winter storm reports, and one of which, which is found in the record at 470, 471, which is in our appendix at pages 10 and 11, is critical to the circumstantial evidence that really is undisputed in the case. And that is that at 11 o'clock on December 6th, 11 p.m. on December 6th, the City of Geneva and Mr. LaMare declared that Phase 3 of the snow plan, the snow and ice plan, was completed. And the significance of the fact that Phase 3 was completed at that time is that the finding is that the Zule parking lot where this accident occurred had been cleared of snow and ice from curb to curb. And so as of that time, December 6th at 11 p.m. of 2009, we know that the Zule parking lot, where the ice later formed unnaturally, was a clean slate. It was cleared from curb to curb. One of the, and so we also have evidence, which we put in the record, that indicates that the back draining that took place where an end loader takes the large piles of snow and back loads the bucket and brings the huge piles of snow back onto the clean pavement, that was done based on the testimony of Mr. LaMare on December 8th, the day before the accident. And that was done in the south end of the parking lot where the drains were. One drain was in the street on Route 25. This is a parking lot right across from the mill racing. And that is the location on one of the photos, which is in the record also, where the plaintiff fell. And that is in the south end of that parking lot where there was a patch of ice. Did Mr. LaMare actually testify or did someone in their deposition testify that back dragging was used there or that back dragging was a method that could be used? I think the record is unequivocally clear that back dragging was done on December 8th based on the natural progression of when the back dragging is done in these situations. And I think that Mr. LaMare said that he believed it was done on December 8th, the day before the accident. And I'm relying on his testimony at RC 851, 852. And there he believed that the snow was removed, the back dragging occurred on the day before the accident. The other evidence that we put in of record was some of the NOAA reports from, I think it was DuPage, the Geneva observer from NOAA. And then of course we have Mr. LaMare's winter snow reports, which we believe are admissions against interest by the city of Geneva. And those facts that are admitted are against interest that are contained in there. But the evidence is clear also that there was no precipitation of any kind after December 7th, or on December 7th, 8th, or 9th. So what we have as of December 6th is a clean parking lot as of 11 o'clock. The evidence of record is that there's no further precipitation beyond that point in time until the accident occurred. We have the plaintiff testify that on the date of the accident, December 9th, she comes in at 2 o'clock and she says it's sunny and that the streets were wet. She also indicated that there was snow in that parking lot. And she also indicated that around the periphery of the parking lot, including the grassy knoll area on the southern side by where the drain is in the parking lot, that there were snow piles. In fact, there were cars parked against the retaining wall on the east end of the parking lot, and that snow was piled up to the hoods of those vehicles. So we have a situation where we have snow piles, the sun is out, the weather temperatures are indicated in there as well, and we have a situation where we know that the city is backdragged and that since December 6th at 11 p.m., that there was no other way of record that the snow could have ended up and the ice ended up in the location where the plaintiff fell. And for that reason, we believe that this was an unnatural accumulation. The backdragging is the most probable reason, as well as the thawing and refreezing on the elevated areas of those snow mounds for the accumulation of the ice that my client fell upon. Opposing counsel in some of their briefs have indicated, well, there are a lot of other reasons how the snow could have gotten there. And while we can speculate as to what those reasons were, those reasons do not appear in the record in the form of sworn testimony. As far as other cars coming in or out with snow on their tires or their hoods and various other reasons, there is no evidence of record to support any of those arguments. The only evidence of record that we have is the evidence that we've provided that establishes that the probability is that the ice was formed as a result of the backdragging of the city of Geneva. If the backdragging was finished the day before, how is that affecting 11 p.m. the next day, 24 hours later? Obviously, they did not remove all of the snow. Well, did your client say that when she got there at 2 o'clock, she saw snow? Yes. On the pavement? On the pavement, yes, of the parking lot. But she did not say anything about snow being on the street. In fact, she said the street was wet. Okay. So, and with regard to the specific cases, I think the Zircina case clearly indicates that where a municipality moves snow mounds, that clearly it is an unnatural accumulation. So the backdragging procedure itself caused the unnatural accumulation. And I think that the cases, we both, all of us have cited all sorts of cases about the ice and snow. And I think that they're all factually detailed. They're factual specific. And I'm not aware of any cases that dealt with a specific backdragging type of issue. The only issue we're talking about, there are a lot of cases about plowed snow and the melting and refreezing, and we've all cited those cases. When you say the city did the backdragging, do you mean Hillcrest as an agent of the city? No, no. Or the city had its own equipment? The city sent its own crew out to do that work. They had three people out there with an end loader and dump trucks. And in the record, the procedure that's used is Mr. LaMere told the Hillcrest to plow, just to simply plow the snow. And he told them to plow it down into the south end of the area. So some of the, a lot of the snow was plowed off onto the grassy knoll in that area where there is a drain. And so the procedure that was used is the city sends an end loader out. The end loader with the big bucket comes and then it backdrags it back onto the clean surface of the pavement, which is in the area where my client fell, based on all of the records. And then they scoop up the snow, and then they drive it over to the entrance. There are two entrances there, and it's a one-way parking lot. But where they, the testimony is where they put the snow into the dump. The dump is on Route 21. I'm sorry, Route 25, because it can't fit in the parking lot. So then they move it over, and then they dump it into the dump truck. And Mr. LaMere indicated that there are times when he's seen spillage out of the bucket as well during that procedure. So Hillcrest had nothing to do with that. But their snow piles have remained around the periphery of this lot since December 1st and 2nd, when they were last there and pushed the snow out. So their work is still in that area, and that is why we've taken the position with respect to that. There's also an issue that was raised about, well, there was an intervening snow event on December 6th. And we take issue with that because this Geneva snow observer from NOAA indicated that there was no snow that day. Mr. LaMere eyeballed what he believed was a quarter inch of snow a half a mile away at the public works building. But there isn't any testimony specifically whether it snowed at the Zool lot that specific day. And then we had also put in the NOAA report relating to the DuPage airport, and there was a trace of snow that had fallen, although it was too little to measure. Regardless of that, that's somewhat of a red herring because that snow concluded, according to the weather report of Mr. LaMere, by 930 on December 6th. And as you recall, the phase three finding that the lot was clear of all snow, that this particular lot had been entered at 11 o'clock that night. So that report also indicates that there was an inspection between 10 and 11 and that nothing was needed to be done with that lot. One other issue, and it really is uncontroversial... Is clear of snow a technical term for purposes of people in the business of removing snow? I mean, to me, in my mind, experience in life, it's almost impossible to remove all the snow from a big parking lot. Well, the definition that we're constrained to is that it says that... I believe the definition used by the city in the snow and ice plan is that it had been cleared of snow and ice from curb to curb. So to me, that means that we're working with the clean slate. My question is, is that use of the word clear of snow and ice a technical term used in the trade of removing snow removal? I do not believe that there's any evidence of record that defines it in that way. I don't think that there's any evidence of record indicating one way or another. And for me to indicate that, I don't know that that would advance either side. I do think, though, that for the items that we're talking about, they're all areas that come within our common knowledge relating to snow and ice. We do not need an expert. And you cited the case that indicates that for re-thawing and re-freezing cases. I think I've cited the case, and I put the quote in my brief, the Johnson v. National Supermarkets case. All of these things really come within our common knowledge. And I think that we do not need an expert to indicate any of these items that we've argued. The one other thing that I think is of importance. Let me, before you get there. Although you don't need an expert, and I accept that premise, in all of the other cases, or at least in the other cases cited and discussed between counsel, there has been some evidence and some independent evidence, in addition to the alleged victim, that there was the action. You could see the trickle of water that came from point A to the slippery spot. There was some evidence. Your client testified that she, you know, it was wet when she went in, and it was colder when she came out. But she didn't ever testify to a trickle, to a channel, to anything of that nature, nor a dip or a chip or a crack in the pavement, correct? Right, yeah. I think that's exactly right. And I think what she testified to is that it was smooth, thin ice, that it was round, you know, the size of a basketball. It wasn't ruddy, so there aren't tire tracks through there. It was thin ice. And I do believe that at least two of the cases that you're talking about that we've cited, Russell v. Lake Villa, and I believe, I'm not sure which of the other cases offhand, there was, I think it was that other second district case. I understand what you're saying. And you're saying in those cases, I think it was the Metra train one, you're saying the snow pile and the, I think it was Johnson, that there was a trail of ice between the snow pile and the pile of ice. I don't think that we should limit. In this case, if backdragging did occur, which is what our position, it did occur, rather, that is our position, and the fact that the snow was placed in the location where the ice was actually formed, I don't think we need to see a continuous trail from a snow mound. Any other questions? Your theory is that the city had to remove every speck of snow from that parking lot. My theory is almost exactly that, because if they put the unnatural accumulation there, they must remove it. And it's no different if the city's end loader broke down in that location and they re-greased it there and they dropped the grease in the parking lot there. We wouldn't have any doubt about it among us sitting here talking today that they needed to remove all of that grease, because if they left something behind and it caused an injury to somebody, they would have notice of that condition like they had notice of this condition, both actually and constructively because they created the condition, and they would have to remove that grease or oil. No, thank you. Counsel, you'll have a chance to reply. Oh, thank you. Are you ready to proceed? Yes, Your Honor. May it please the Court. Counsel. Anthony Ricciardotto on behalf of the city of Geneva. I'd like to start off by saying Mr. Romare never saw any of the conditions in this parking lot. He cannot attest to what the conditions were like on the Wednesday before she fell or on the night that she fell. The only eyewitness to this occurrence, counsel's picking up little excerpts out of the winter storm reports, which were based upon Mr. Romare's testimony, the storm reports were in the storm plan were just guidelines for him to organize his crews to plow 244 curb miles of street to clear 130 lineal miles off sidewalk and to remove ice and snow in 26 parking lots. He testified that none of the statements in those winter storm reports are attributable to any specific parking lot condition at any specific time. Counsel, in their brief, makes reference to one line where it was called in that the brine on the street, on the roadway, was being effective. Okay. And Mr. Romare specifically denies that that statement is related to this parking lot. He says that that's a generalized statement indicating that the salt on the roadways was actually working to clear off the ice. The only eyewitness to this occurrence on December 9 at 11 p.m., well, let's start at December 9 a little earlier, is the plaintiff herself. And the plaintiff's own testimony essentially negates or defeats all of the action, all of her claims in this lawsuit. On page 705 in the record, there's a photograph where she uses counsel. She uses this photograph to show where she is parked in this lot. And in this, there's a white Monte Carlo parked in the spot where she was parked. This is the very south end of the parking lot. And she testifies that around 2 p.m. she drives into the parking lot and she parks facing eastbound. And all along here, all along this landscaping, there are mounds of snow almost at her hood level. Okay. And as she's parked there, she looks to the north, and that's really the length of the parking lot. She looks to the north and she sees the length of the parking lot. And what does she see? She sees approximately less than a half of an inch of snow accumulation on the parking lot surface. And that coincides with her testimony. This is, again, this is on 584 where she said it had snowed all week that week, with the exception of the day before her accident. And we have the weather reports. We have Mr. LaMera's testimony who actually measured a quarter inch of snow on the Wednesday before this event occurred. Okay. And there is no conflicting testimony. He measured a quarter inch of snowfall, and that occurred on Wednesday, two nights before her accident occurred. It's perfectly consistent with what she saw, with the accumulation she saw in that parking lot was the accumulation from the Wednesday night, two nights before her accident. What about the snow report then that says Phase 3 was completed in Geneva 24 hours before the accident? Yes, Your Honor, that's a good question, and I'm glad you asked me that. Because, again, Plaintiff's Counsel takes that statement out of context. Mr. LaMera was making reference to the cleanup efforts from the nine inches of snow that had fallen earlier in the week. If you go through Mr. LaMera's testimony, the different phases are all attributable to that snow event. Phase 1 is, hey, you know, let's clear the main snow routes throughout the city. Phase 2, then, is we want to go into do the side streets, clear the side streets and any possible alleys. And Phase 3 is where our crew had cleaned up all of that after that snow event. Is what he said a question of fact for a fact finder? Pardon me? Is what the manager said a fact question, the meaning of what he said? No, absolutely not. Tell us why. Because Mr. LaMera was not in that parking lot on Wednesday night. Mr. LaMera cannot testify that there was no snow on the surface of the parking lot on Wednesday night. He's never been there. He got notice. He received notice of the plaintiff's accident and went there three days later. By that time, the snow had all gone. So Mr. LaMera was strictly speaking based upon his guidelines, saying that, well, you know what, he's got the discretion. He's got the discretion at some point to stray from the guidelines. He's got discretion to determine whether he wants to use ice or plow or when to declare certain phases are over. On Wednesday night, he declared Phase 3 over. Phase 3 was programmed. Didn't they have an individual that's responsible for examining each parking lot and reporting back as to the condition of the snow in the parking lot? No. To him? No. No, Your Honor. So there's no testimony other than the plaintiff's own testimony establishing the conditions in the parking lot. So going back, she clearly testifies that it snowed all week, the week before her accident, except for the day before. OK? And she arrived at 2 o'clock. She saw the snow. She parked facing east, and she saw the snow, and it was unshoveled and unplowed. Her testimony is unequivocal that that snow was unshoveled, unplowed, and unsalted. That's perfectly consistent with what Mr. LaMere said. Mr. LaMere said that after that Wednesday snow event, he never ordered any more snow removal services in that lot because the accumulation was too small to warrant it. Well, then why is there some statement that the 24 hours before Phase 3 was completed? Phase 3, that goes back to the initial event. It was just in one of the multiple weather reports that he generated. It wasn't anything specific to this parking lot. He declared Phase 3 was over and done with, but he didn't testify that the lot was perfectly clear of ice and snow. Does he ever say that I didn't order anything for the measured snowfall on 12-6? Yes, Your Honor. He does have a statement of that effect somewhere. Yes, it's in the record. It's in my brief. The specific pages where he testified that he did not order any more plowing after that event is in the record. It's a matter of record. And then with respect to the specific ice patching question, we still need, even if there was this backdragging thing, which Mr. LaMere never testified that he saw or confirmed through any of his people that this alleged backdragging occurred, he said it was a method that they commonly used to take the backhoe and slide the snow piles off of the landscaping and grass. Your opposing counsel totally disagrees with you. Well, there is nowhere anywhere in the record is it established that Mr. LaMere was there and saw that the backdragging occurred. There is no witness that says there was backdragging that left snow on the parking lot surface. There is no witnesses or testimony establishing that when they were allegedly backdragging that they spilled snow on the parking lot. Not to mention the crane case. The crane case requires a nexus between the alleged ice with her fall. Well, where is the nexus? Okay, if there was backdragging that was done, well, then where in the parking lot was it done? And then if there was snow spilled as a result of it, where was that snow spilled? And if the snow was spilled, when did the snow melt? And if the snow melted and it refroze, where was the ice that formed as a result of the backdragging? The plaintiff has to come up with some evidence to show us a nexus between that conduct and the ice, the basketball-sized ice patch that she fell on. And there is no nexus. And quite frankly, again, going back to the plaintiff's own testimony, which negates all of her theories, her testimony clearly shows that there was no backdragging anywhere near where her car was parked. Mr. LeMaire testified that the backdragging was done so the landscaping wouldn't be damaged or destroyed. Well, going back to a picture of page 705 in the record, she testified that all the snow mounds were still around her car, in front of her car, and along the retaining wall along the east side of the parking lot. So if there was any backdragging done in that parking lot, it certainly wasn't anywhere near where she fell. It might have been at the far north end of the parking lot. But the evidence she establishes that there was no backdragging done around her car or in the immediate area where she fell. Photograph 719 shows in the record where she pointed to where she fell in the parking lot. And I highlighted it in yellow so you can see where she fell. Now, she testified that all of the snow was still on the landscaping in the area by her car. Well, then obviously no backdragging was done in the area where she fell. She testified that there was nothing wrong with the surface of the parking lot. No defects, no depressions, no cracks. And the ice wasn't there at 2 o'clock when she got out of her car. As a matter of fact, she was there the day before on Friday. And on Friday, she said that it hadn't looked like anyone plowed the lot for at least a couple of days. Any questions? Thank you very much. Thank you, Your Honors. I ask that the judgment of the lower court be affirmed. Counsel? May it please the Court, Your Honors, Counsel? My name is Julie Simpson, and I represent Hilquis Brothers Excavating, Incorporated, in this matter. The trial court properly granted summary judgment in favor of my client. And I'm here today to ask the court to affirm that lower court's ruling. It's based on the record. The record reveals that Ms. Toczek has set forth no evidence beyond conjecture, guess, surmise, to create the requisite nexus between the work performed by Hilquist 7 or 8 days prior to her incident and the alleged falldown incident. How do we know that it was 7 or 8 days prior when the LaMare report talks about something being completed just the night before? Hilquis Brothers, their contract with the city required snow plowing, and that was all. The record shows that Hilquis Brothers was in the Zulot on December 1st and 2nd and did not return, was not called, was not required to do any further work. So between the 2nd and the 9th, we assume that 7 days elapsed between the time that they left and completed, and Ms. Toczek had her falldown incident. The other thing is Hilquis was not responsible for salting either.  And the understanding and the contract between Hilquist and the city was that Hilquist would be called to perform work as needed, and Mr. LaMare, as superintendent of streets, was the person who would make the decision to bring Hilquist in. And that was what was done on December 1st and 2nd. We had a storm event, much like we had last Friday, a large amount of snow over the course of a 2-day period. Hilquist cleared the lot. And then beyond that, a sequence of events took place that were not in any way related to the acts that Hilquist performed on the Zulot. These things include, if you look at the weather report submitted by the plaintiff with her brief, there are 13 instances of what we call trace precipitation. We're not certain what that was. It could be snow, just like we had this past weekend where we had fog and mist. All of these things are precip that ultimately can leave a wet surface. Ms. Toczek, as counsel indicated, as Mr. Echavarria indicated, Ms. Toczek testified that it snowed all week prior to her incident. And it was snow on the lot when she arrived for work that afternoon on December 9th at 2 p.m. Further, there is a dispute as to whether the backdragging was done. It was a custom and practice of the city of Geneva to do such backdragging. As Mr. Ricciaravato indicated, there is no evidence as to exactly where that was done and whether or not the snow was put back on the pavement. But in any event, whether or not it was done in the area of Ms. Toczek's fall, that was not a result of anything that Hillquest did or did not do. Ms. Toczek's counsel talked about the fact that the record does not include any evidence of other cars coming in and out of this lot. This is a public lot right off of Route 25 across from the Old Mill Race Inn. There's testimony that it was used by employees. Ms. Toczek testified to that. When she arrived for work that day at 2 o'clock, the lot was full. Obviously, other cars had come in. There was one way in and one way out. Ms. Toczek parked her vehicle right at the ingress of that lot. Mr. LeMaire testified that customers used that lot as well. It's a public lot. So while we don't know the exact number of cars that came in and out, it is a common occurrence that cars driving in the winter after a big snowfall bring and track water, slush, snow, or whatever it is they pick up off the roadway. To enter this lot, you have to drive over the sidewalk that runs along Route 25. Ms. Toczek testified that that sidewalk was slushy. It was wet. It had snow. She drove her own car over that sidewalk to get into the lot. She parked right at the ingress. Her own vehicle could have brought in the water that ultimately froze. Again, this would not be the result of anything that Hillquest did or didn't do. Questions? No. I'm going to give this your sign-off. We would just respectfully ask that this court affirm the lower court's grant of summary judgment in favor of Hillquest Excavators. Thank you. Thank you. Counsel, do you wish to offer a reply? Yes, sir. You okay? Yeah. Okay. Are you slipping and falling? Yeah. One of the other issues that we didn't talk about was the amendment issue. And, you know, I ran out of time, so I didn't get a chance to raise it. But, of course, we would ask that the court reverse on that issue as well. Beginning to respond to the arguments. Let me ask a question, Mr. Murphy. In your mind, is there anything other than circumstantial evidence in this case? There is direct evidence. And Mr. Lemaire gave it, that there was backdragging on December 8th in that location. The record is really- But he wasn't there, was he? He gave testimony. No, but they all report to him. He sent them out to backdrag. Well, he sent them out to clear. No, he sent them to backdrag. And he testified. It really is undisputed that it occurred at this lot. No one can say to any of us here that that did not occur during that period of time. That's unequivocal in the record. The backdragging occurred. And it occurred in the area where the plaintiff testified she fell. All right, but your client said that as she looked across the lot, she saw snow covering the lot. Well, if they only backdragged in the area of her car, where did the other snow come from? I'm not saying that they only backdragged in any other area. I'm saying they backdragged and they created that unnatural accumulation. Whether they backdragged somewhere else, we didn't get into that. But my position also is that in backdragging, this wasn't a hit or miss of spilling snow. The backdragging created a blanket of snow in that lot? No. No, my position is that they pull the snow onto the clean lot, and wherever they pull it, that's where the snow is. And then they try to scoop it up and take it away. Exactly, whether it was a blanket or not, I don't know. The record doesn't reflect that. But I will say this, and with all due respect to Counsel Mr. Retrovato, he and I disagree entirely about what the record says. I do not believe that the record supports any of his arguments. And I would really ask that you look at the record, that you look at it painstakingly, because we have dealt with all of the issues that he's raised. The plaintiff's testimony is not inconsistent with her theories. I put it on page 9 of my brief. I won't read it to you. But page 9 talks about it. There's no establishment that she was at that zoo a lot prior to this. She says, for instance, he's saying essentially that it snowed all week. She testified that she thought it had been pretty much snowing all week. Then she said it didn't snow the day before. Then she qualified by saying she thought it snowed more towards the beginning of the week, and there wasn't any establishment that she was at that location at any time in that week. So there's just been a real distortion, I believe, of the record. I believe that you should really read the record and take a look at it. The backdragging occurs. Did she or did she not testify that when she looked across the lot, she saw snow and it was wet? I believe that she testified that she saw snow along in the lot in patches. This I believe. I may be mistaken. What did she indicate it was patches? Pardon me? I said do you recall the page at which she indicated it was patches? I can take a look. In my initial brief I went through pretty carefully what exactly the evidence was, and I broke it down so I could just take a minute to see if we talked about that. Now, you're talking about at the time of the accident as opposed to 2 o'clock? No, 2 o'clock in the afternoon. 2 o'clock, the arrival time. Okay. My recollection is she didn't testify much about the rest of the lot at the 11 p.m. or the evening when she went out and fell. I don't believe so. I think it was concentrated more on the specifics of the patch of ice because we were talking about ‑‑ I'm sorry, I'm having to try to find it here. I had it in a separate section, I believe. Oh, page 3, I think. Page 3 of your brief? Yes, on my opener. I noticed she said there's less than a half an inch of snow in the lot. And where are you looking? The question was, you said she said it was in patches, and my question is do you recall that in the record because I don't. It may have been that she said that at the time of the accident. I think when she returned to the lot later on that that's when there were patches. So what happened, does she explain away what happened during the day? I don't think that there was any ‑‑ yes, she said that she was working in the restaurant and that there was no precipitation that day and it was a sunny day. Any other questions? No, I don't, but I think he has something he wants to say. I'll give you a minute to sum up. Thank you, Your Honor. We would ask that because there are fact issues with respect certainly to the back dragging and these cases are facts and there's appropriate notice and there was a creation of an unnatural condition. We would ask that the court's order in all respects dismissing or granting the summary judgment and granting the 619 motion relating to the inadequacy of lighting be reversed. Thank you very much. Thank you very much, counsel. You will be recessed for ten minutes. Thank you both.